**READING COMPANY**

v.

**NORFOLK SOUTHERN RAILWAY COMPANY.**

**Civ. A. No. 91–7577.**

United States District Court, E.D. Pennsylvania.

Oct. 4, 1994.

John W. Morris, Philadelphia, PA, for plaintiff.

Andrew J. Walko, Edward C. Toole, Jr., Clark, Ladner, Fortenbaugh and Young, Philadelphia, PA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DITTER, District Judge.

In this case, Reading Company claims that Norfolk Southern Railway Company must reimburse Reading for a portion of the pre-bankruptcy freight loss and damage and overcharge claims that Reading paid in full pursuant to its plan of reorganization.

After consideration of the deposition testimony, the documents, and the arguments of counsel, I make the following

### FINDINGS OF FACT

1. Plaintiff, Reading Company (Reading), is the successor in interest to Reading Company (Debtor), a railroad company that filed for bankruptcy protection in this court on November 23, 1971, under the caption *In the Matter of Reading Company, Debtor*, Bky. No. 71–828. Debtor ceased rail operations on April 1, 1976, when Debtor's assets were conveyed to the Consolidated Rail Corporation. Debtor was reorganized and emerged from bankruptcy as Reading Company on December 23, 1980, the consummation date of its plan of reorganization. Reading is a Pennsylvania corporation with its principal place of business in Pennsylvania.

2. Norfolk Southern Railway Company (NS), a Virginia corporation with its principal place of business in Virginia, is the parent corporation of both Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern). Before NW and Southern became subsidiaries of NS in 1982, NW and Southern operated as independent entities. At some point before 1982, Southern had a subsidiary known as Norfolk Southern Railway Company (Old NS). Old NS completely merged into Southern Railway Company before the consolidation of Southern and NW as subsidiaries of NS. NS is the successor in interest to NW, Southern, and Old NS. NW, Southern, and Old NS will be referred to as NS predecessors.

3. Debtor, NW, Southern, and Old NS each operated as part of the interline freight carriage system. This system made it possible for American railroads to route shipments to their final destinations using other railroads' facilities. During the early 1970s, many railroads experienced financial difficulties and filed for bankruptcy reorganization. Due to the interrelationship of all railroads, those that were solvent were affected by the bankruptcies. In June, 1970, the solvent railroads organized the Committee of Interline Railroads (Interline Committee) to represent their common interests in the various railroad bankruptcy proceedings. The Interline Committee appeared as a party throughout most of Reading's reorganization, but disbanded sometime in the early 1980s. The NS predecessors were members of the Interline Committee. NW and Southern served on its steering committee, the principal decision making body. At all times the Interline Committee acted with the full authority of the NS predecessors.

4. Because of the unique dependency of American railroads on each other, a specific set of accounting rules had been established by contract among members of the industry long before the events in question here took place. These rules are contained in the Association of American Railroads' (AAR) Rules of Order, the AAR's Principles and Practices, and the Freight Claim Rules of the Freight Claims and Damage Prevention Division of the AAR, collectively referred to as "AAR rules." Debtor and the NS predecessors were parties to the AAR rules, which governed the way they adjusted claims arising out of their freight operations. These

rules were assumed by Debtor's trustees as part of its reorganization.

5. When freight was lost or damaged in rail transit, an affected party could file a claim for compensation with the origin (or receiving) carrier, the destination carrier, or the carrier causing the injury. The claim would be investigated, settled, and paid by the carrier with which the claim was filed except in two instances: (1) where the damage was caused by an easily identifiable incident, such as a wreck or fire, in which case the carrier on whose line the event occurred would provide "a statement of the circumstances and an opinion as to liability," and (2) where the claim was filed with more than one carrier, in which case the carriers would notify each other and collaborate. The paying carrier could seek contribution from each of the interline carriers that participated in the freight carriage, generally in an amount proportionate to the distances involved.[1]

6. Throughout Debtor's reorganization, the Debtor and the NS predecessors regularly settled and allocated among themselves claims relating to post-bankruptcy shipments, i.e., those occurring after November 23, 1971, and until the cessation of Debtor's rail operations on April 1, 1976.

7. However, pre-bankruptcy claimants, i.e., holders of claims relating to carriage prior to November 23, 1971, who had not been paid by Debtor prior to that date, became its creditors. Debtor investigated and adjusted the claims, but the ultimate payment of those claims had to await approval of a plan of reorganization.

8. The NS predecessors also became creditors of Debtor's bankruptcy estate. The NS predecessors filed claims against Debtor for loss, damage, and overcharge claims which *they* had paid prior to November 23, 1971, but which they had not allocated to Debtor or been paid by Debtor prior to that date.

9. Pursuant to its plan of reorganization, Reading issued unsecured notes in the amount of $284,000.00 to the pre-bankruptcy shipper-claimants. Reading redeemed these notes in 1988. Some claimants also received small amounts of cash in 1981 to accomplish rounding; a few claimants chose and received a 15 percent cash payment in 1981 in lieu of a note. Total cash payments were $13,369.26.

10. In satisfaction of the NS predecessors' pre-bankruptcy claims against Debtor and pursuant to its plan of reorganization, Reading issued notes to the NS predecessors in the following amounts: NW $10,700.00; Southern $5,100.00; Old NS $600.00. The value of the NS predecessors' notes at maturity in 1988 was $25,912.00.

11. Reading's instant claim is for the NS predecessors' allocable share of the pre-bankruptcy loss, damage, and overcharge claims for which Reading issued its notes pursuant to the plan of reorganization and which Reading ultimately paid in 1988.

12. Reading claims that NS is responsible for an allocated share of these claims in the amount of $111,524.36. In 1988, Reading offset against this claim securities otherwise redeemable by NS predecessors in the amount of $25,912.00. Additionally, four shipper-claimants failed to redeem their securities, thereby reducing Reading's allocation claim by $764.63. Net of the offset and reduction, Reading's claim is for $84,847.93.

13. Throughout Debtor's reorganization the interline railroads, including the NS predecessors, were aware that among them and Debtor there were reciprocal claims relating to the allocation of pre-bankruptcy freight loss, damage, and overcharge shipper-claims. The matter had been specifically discussed by H.M. Sutton, a representative of NW, and Louis J. Hauer, Debtor's freight claim agent, shortly after the filing of Debtor's bankruptcy petition. Therefore, as early as 1972, NW was aware of the need to keep its records pertaining to interline matters with Debtor prior to November 23, 1971.[2]

---

1. There were a number of other formulae used to allocate the damage payment among the participating carriers; this, however, was the most common.

2. There was a similar need to retain records with regard to each of the other bankrupts, including the Penn Central.

14. Knowing that these reciprocal claims were undeveloped, as yet of an uncertain amount, and thus not ripe for allocation, the parties repeatedly agreed that they would treat each other's claims with "flexibility" and that the claims would be honored.

15. On August 31, 1979, the Interline Committee filed objections to the trustees' plan of reorganization. In Objection 13 the committee acknowledged that "Reading has claims against some of the Interlines in the same interline and miscellaneous accounts in which the Interlines have claims against Reading."

16. The Interline Committee went on to suggest that Debtor appoint an experienced freight claim accountant to compute its allocation claims. Further, the committee promised Debtor that it would "continue to represent its members in resolving the recovery of the relevant percentage of freight loss and damage, overcharge, personal injury and property damage claims asserted by Reading." Neither the NS predecessors, nor any other carrier, suggested it could not participate because its records had been destroyed.

17. Reading hired an experienced freight loss and damage accountant to review the pre-petition claims and calculate the appropriate allocation charges against participating carriers.

18. In September, 1979, Debtor's trustees petitioned for authority to establish a plan to liquidate pre-bankruptcy claims, noting they included "216 claims for freight overcharges at a total claim value of $208,235.03 and 190 claims covering freight loss and damage totalling $591,052.73." The trustees qualified these figures by stating that approximately 35 percent would be Debtor's obligation, the rest being the obligations of participating interline carriers. This document was served on the Interline Committee. From its detail down to the penny, it is concluded that Debtor had investigated the underlying claims and made the allocations it thought appropriate.

19. In response to the trustees' petition, the court signed order No. 1731, dated October 9, 1979. It provided for the liquidation of pre-bankruptcy shippers' claims and those of other railroads, including the NS predecessors.

20. Pursuant to order No. 1731, the NS predecessors presented their pre-bankruptcy claims, including their loss, damage, and overcharge allocation claims against Debtor. In essence, this order did not require supporting documentation of a claim where its amount was confirmed by the Debtor's records. The NS predecessors' claims were accepted, verified, and eventually paid pursuant to the plan of reorganization.

21. On June 8, 1981, at the request of William R. Glendon, counsel for the Interline Committee, Reading sent him an estimate of its allocation claim against each of the interline carriers. Glendon circulated these estimates to each of the NS predecessors and advised that formal bills would soon be sent. Glendon suggested that members of the committee take no action on the Reading claims pending settlement of similar, but much larger claims from Penn Central. Glendon also suggested that members forward to him "a brief summary of any facts or documents you have in your possession which could be used to defend against such claims." At this time, Glendon had no intention of defending Reading's claims on the basis that they were time-barred but was rather prepared to defend them, if at all, on their merits.

22. No real objection was made to Reading concerning these claims.

23. At no point prior to Debtor's final statement of the account in 1988 did the defendants or the Interline Committee contest the NS predecessors' eventual responsibility for the properly allocated portions of the pre-petition claims which Reading paid to loss, damage, and overcharge claimants.

24. In 1981, after Reading made a final compilation of all of the pre-bankruptcy claims and issued appropriate securities to the shipper-claimants, Reading wrote to each of the NS predecessors, stated the account, and demanded payment of allocable shares. Demand upon NW for $25,531.04 was made by letter of August 19, 1981; demand upon Old NS for $1,124.06 was made by letter of August 28, 1981; demand upon Southern for

$85,874.10 was made by letter of September 3, 1981.

25. Included with each demand letter was documentation for each of the underlying loss, damage, and overcharge claims indicating, *inter alia*, the identity and address of the claimant, the date of presentation, the amount and nature of the claim, the liquidated amount, the waybill number of the carriage, identification of the carriers participating in the carriage, the en route mileage of each carrier, and the monetary allocation of the claim to each of those carriers. Reading further provided documentation indicating when and how each claim had been satisfied, i.e., by notes, cash or some combination thereof.

26. Reading also sent copies of these letters and the accompanying documentation to counsel for the Interline Committee.

27. By letter dated August 24, 1981, Interline Committee counsel Glendon, told members of the Interline Committee they should not pay Reading's claims until a settlement had been reached with Penn Central concerning its similar claims. There was no suggestion that Glendon believed that the NS predecessors, or any other carrier, had then destroyed its records.

28. Ronald W. Moore, general attorney for NW, received Debtor's letter and that of Glendon. Acknowledging the latter, Moore stated he would take no action on Reading's request. However, Moore asked that NW's Sutton review the documentation received from Reading to see if it would be "sufficient under the freight claim rules to require payment to Reading if it could demonstrate that it has paid the claimant." There was no suggestion that Moore then, or immediately thereafter, had any reason to believe NW's pertinent records had been destroyed.

29. NW made no response to the statement of account rendered by Reading on August 19, 1981. NW accepted the sufficiency of Reading's claim documents "under the freight claim rules" as shown by their being forwarded for review by a designated employee, his failure to comment adversely about them, and NW's failure to object to Reading about them. In addition, there was no statement by NW that it could not verify Reading's statement of account because its own documents had been destroyed.[3] There was no contention that Reading's documentation was unsigned or insufficient.

30. Old NS made no response or objection to the statement of account rendered by Reading on August 28, 1981. There was no contention that Reading's documentation was unsigned or insufficient. Further, there was no statement by NW that it could not verify Reading's statement of account because its own documents had been destroyed.

31. By letter of September 18, 1981, Southern responded to Reading and objected to the overcharge portion of the claim in the amount of $516.26. Southern made no response or objection to the loss and damage portion of Reading's claim.

32. Edward C. Toole, Jr., counsel for the Interline Committee, responded to Reading on behalf of NW, Southern, and Old NS. Specifically, interline counsel took the position that Reading's allocation claims were not payable until Reading actually redeemed the securities issued to the underlying claimants. There was no suggestion the claims would be rejected because they were unsigned, the documentation was insufficient, or that any of the NS predecessors had destroyed their own documents.

33. Other than this objection—that Reading had not yet paid cash on the underlying claims—there was no objection by anyone to the allocations, statements, and documents rendered by Reading.

34. Reading agreed to the position taken by counsel for the interlines because it considered that position to be fair and reasonable and in accordance with AAR Freight Claim Rule 100(a).

35. As a result of these 1981 discussions between counsel for the Interline Committee and J. Stewart Warden of Reading, it was specifically understood and agreed that

---

3. Moore testified that from "Day One" NW wanted to be apprised of the pre-bankruptcy claims filed with Debtor that involved NW. He assumed NW had participated in the process of verifying pre-bankruptcy claims to and from Debtor.

Reading's right to payment would not mature until it redeemed the notes issued to the underlying claimants. In reliance upon this agreement, Reading forbore from taking legal action at that time.

36. In early 1988, Reading redeemed the securities issued to the underlying loss, damage, and overcharge claimants, with the exception of the four claimants who failed to present their notes.

37. On April 1, 1988, Reading wrote to each of the NS subsidiaries notifying them of (1) the redemption of notes issued to the underlying claimants, (2) the maturity of similar notes issued by Reading to the NS predecessors, and (3) the offset of their notes against Reading's outstanding allocation claim. Together with these letters Reading enclosed copies of the 1981 account statements and demanded payment of the balance due.

38. In the absence of any response, Reading again wrote to the NS subsidiaries on October 20 and 21, 1988, again stating the account and demanding payment.

39. By letter of October 26, 1988, Moore, now senior general counsel for NS, responded on behalf of each of NS's subsidiaries. Moore claimed that Reading's recent letters were "the first notice of Norfolk Southern management of your present claim." This was inaccurate as Reading had submitted its claims together with supporting documentation in 1981.

40. By the letter of October 26, 1988, NS objected to Reading's claim on the ground that Reading had failed to assume as an executory contract the AAR Rules which formed the basis of Reading's allocation claim. NS had never previously raised this objection with Reading.

41. In fact, Reading had assumed the relevant AAR Rules as executory contracts in appropriate filing with this court which were mailed to the NS predecessors on January 12, 1981.

42. When Reading sought to discuss these matters with counsel for the interlines, who had previously undertaken to represent its members in resolving recovery of these claims, it was informed by Toole that the committee had disbanded.

43. Prior to the institution of this lawsuit, NS admitted by letter of December 3, 1991, that it had agreed to defer resolution of Reading's claim until Reading redeemed securities issued to the underlying claimants, but now denied responsibility on the ground that Reading had not assumed the AAR Rules as an executory contract.

44. Federal regulations permit railroads to destroy documents, and AAR rules do not preclude railroads' doing so. There is no direct evidence as to when the NS predecessors destroyed the documents that might have been used to contest or verify Reading's pre-bankruptcy claims, but they have done so. That the documents were still in existence in 1981 is suggested by the awareness of the parties immediately after Debtor's bankruptcy that the pre-bankruptcy claims would eventually have to be resolved; the Interline Committee's knowledge that the pre-bankruptcy claims presented special problems, both as to Reading and Penn Central; memos, correspondence, and conversations which imply the underlying documents still exist; the absence of any assertion before 1988 that these documents had been destroyed; and counsel's statement at oral argument, "in that intervening seven years [between 1981 and 1988], documents were destroyed, memories necessarily faded."

45. Reading's claim for $84,847.73 [4] is an accurate statement of the account which it originally stated in 1981, less credit for the NS notes which it offset and reduction for those four underlying claimants who failed to redeem their securities.

46. NS has not paid the outstanding claim of $84,847.73. It has been due since April 1, 1988, and no reasonable legal or factual defense for the failure to pay it has been stated by NS.

---

4. Reading agrees that due to a mathematical error in its original complaint, its claim was overstated by 20 cents.

## DISCUSSION

Reading, the successor-in-interest to a bankrupt railroad, has brought this suit to obtain partial reimbursement for money paid to settle claims for freight lost or damaged in transit or for which there were overcharges. Basically it is a contract action and the defense, though it has gone through a series of metamorphoses, is now that plaintiff may not recover because neither it nor its predecessor satisfied obligations required by that contract.

Prior to the time that Debtor filed for bankruptcy protection, the parties had had a long history of dealing with each other and the rest of America's railroad industry. Their system for paying and sharing the responsibility for freight loss, damage, and overcharge claims had been created by contract and may conveniently be referred to as the AAR rules. Three aspects of those rules are of importance in this case:

First, in instances pertinent here, when a claim arising out of freight operations was filed with a railroad, it would investigate the matter, pay what it determined was due, and only then have a right to seek contribution from the other lines that had been involved in the transportation of the goods in question;

Second, the rules provide for certain formalities with regard to supporting documentation when a claim for reimbursement is being asserted against another railroad; and

Third, the rules as interpreted by the industry provide that a claim for contribution cannot be made against a railroad if it has destroyed its records as permitted by a schedule found in applicable federal regulations.

While the defendant is correct that Reading's claim for reimbursement was not presented before the time for record-retention had expired, defendant overlooks what everyone involved knew at the time and still knows: the contract which forms the basis of this claim, the AAR rules, was modified by circumstances, applicable law, court orders, and the conduct of the parties. The real question is not whether Debtor and Reading, its successor-in-interest, complied with the strict letter of the AAR rules but whether they complied with the requirements of those rules as they had been altered by the circumstances arising from Debtor's bankruptcy.

They did.

Federal regulations divide railway records into various categories and provide times after which they may be destroyed. In no case relevant to a freight loss, damage, or overcharge claim does the retention period exceed six years. The AAR rules cut off claims for reimbursement after the passage of the federal regulation time for record retention. Moreover, a claim for reimbursement could only be made by a carrier that had paid the underlying claim in question. Therefore, if the AAR rules are applied literally in this case, as the defendant insists they should be, Reading could not seek reimbursement after 1977, that is, after six years commencing in 1971 when Debtor went into bankruptcy. But, as defendant knows, and as its predecessors have always known, Debtor was prevented by law and court order from paying any pre-bankruptcy debt. Pre-bankruptcy creditors, from the mightiest indenture trustee whose rights were set forth in minute detail (and minute print) to the humblest, unsecured claimant, could not be paid until the court approved Debtor's plan of reorganization, an event that did not occur until December 23, 1980. In other words, if defendant's position is correct, neither Debtor nor Reading ever had a right to reimbursement because defendant's records could have been destroyed in 1977, roughly three years before Reading, at best, could have had a right to seek defendant's contribution.

Once it is determined that a literal application of the AAR's rules yields a ridiculous result, i.e., claims for reimbursement were cut off before they existed, the next question is whether Debtor and Reading complied with the AAR rules as amended by the circumstances and to the extent they may have failed to do so, whether strict performance was waived.

They did and it was.

Debtor's bankruptcy was neither the first nor last in the troubled railroad industry in the early 1970s. That these bankruptcies

would have a profound effect on rail operations and create a myriad of legal problems was well-known. It was no longer business as usual, either in the yards and shops, or in the courts. Contractual obligations were altered by the needs of the day—and as frequently, by court decree. Many of the potential legal problems were anticipated and agreements were reached on how they should be handled. These matters were ongoing, negotiated, and well-known. So it was with claims against a railroad growing out of its pre-bankruptcy operations.

The problems that would be associated with the pre-bankruptcy freight claims were noted immediately and discussed between NW and Debtor. Although they were only a small part of the concerns of the Interline Committee, these claims were not forgotten. On August 31, 1979, they were the subject of an objection to the trustees' reorganization plan. The Interline Committee suggested that because the claims involved complicated apportionment concepts a person with appropriate experience should be retained to make the necessary calculations. Reading complied; the claims were prepared, submitted, and received without objection being raised to their form or the adequacy of their supporting documentation. There was only one objection: Reading had not paid the claims but had only promised to pay them by issuing notes that would not come due for several years. The AAR rules said Reading had no right to reimbursement until it had actually paid the shipper-claimants. Reading should wait.

It did.

In the spring of 1988, the last claimant who had presented his note had been paid. After waiting for seven years, Reading sought reimbursement only to have NS profess ignorance of the whole business and assert meritless defenses laced with righteous indignation.

Defendant seems to rely on two principal defenses at this time: the documentation presented by Reading in 1981 was unsigned and deficient in other ways, and secondly, Reading had a right to be paid in 1981 and its claims, not asserted by formal demands until 1988, are now barred because at some time or other, NS predecessors destroyed their documents.

It may well be that when Reading presented its claims 13 years ago they could have been challenged on technical grounds: perhaps they were unsigned, they were in the wrong order, something was missing, but that was not the defense. The defense was wait. You haven't paid and so we don't have to pay you. Nothing was said about poorly prepared papers, document deficiencies, or missing signatures. Nothing was said until now. And now is too late.

I likewise reject NS's second defense: that Reading should not have agreed with NS's authorized representative to wait to pursue this matter until Reading had actually paid the freight-claimants, as provided by the AAR rules, because Reading should have known NS would destroy its records in the meantime.

This is a contract case and the intentions of the parties must prevail. All parties involved were aware that unique circumstances altered the contract. In fact, the court altered the contract. In fact, the parties altered the contract.

When Interline Counsel said appoint, Reading appointed.

When Interline Counsel said submit your statements, Reading submitted.

When Interline Counsel said wait, Reading waited.

Everyone who had been there for the opening bell of bankruptcy and had stayed in the arena knew that the contract had been altered. The time for payment was in 1988, six years ago.

I reach the following

## CONCLUSIONS OF LAW

1. The court has diversity jurisdiction over this matter: the parties are citizens of different states and the amount in controversy exceeds $50,000. Having supervised Debtor's reorganization, the court also has jurisdiction as reserved in its consummation order and final decree.

2. Debtor and the NS predecessors were each obligated to the other for their allocable portions of freight loss and damage and overcharge claims arising out of their joint carriage.

3. Even though Debtor had gone into bankruptcy, it continued to receive freight loss and damage and overcharge claims arising from carriage occurring prior to November 23, 1971, the date when it sought bankruptcy protection. Although Debtor investigated those claims, their payment had to await this court's approval of a plan of reorganization. Similarly pending throughout the reorganization were NS's allocation claims against Debtor relating to pre-bankruptcy carriage.

4. Throughout Debtor's reorganization, the parties knew of each other's pre-bankruptcy allocation claims and anticipated receipt of formal statements of accounts.

5. Debtor liquidated NS's proofs of claims, and Reading properly satisfied NS's claims pursuant to its plan of reorganization.

6. Debtor properly verified each of the underlying pre-bankruptcy freight loss and damage and overcharge claims against it pursuant to order No. 1731. Reading satisfied these claims pursuant to its plan of reorganization through the issuance of notes and the payment of cash.

7. NS never objected to the procedures established by this court for verifying and liquidating the pre-bankruptcy freight loss and damage and overcharge claims. Although it had the opportunity to do so, NS did not participate in the verification process of any claim or object to any claim. Because it was notified of the verification process and its right to object to any or all of the claims, NS's failure to participate and object constitutes a waiver of any right to take exception to the liquidations that occurred.

8. Reading properly investigated the pre-bankruptcy claims and liquidated them. It followed the procedure for allocation suggested by the Interline Committee.

9. By its letters of August 19, August 28, and September 3, 1981, Reading formally stated the pre-bankruptcy freight loss and damage and overcharge allocation accounts. The amounts of its statements were correct.

10. Together with the account statements, Reading provided documentation of the underlying claims sufficient under railroad practices and the AAR rules as modified by the circumstances of bankruptcy.

11. The absence of any objection after the passage of a reasonable time by or on behalf of the NS predecessors to the account statements, the allocation methods, and the allocated amounts constitutes an acceptance thereof. The absence of any objection after the passage of a reasonable time to the accompanying documentation constitutes a waiver of any right to take exception to that documentation at this time.

12. The objection of Southern to the overcharge item of $516.26 is rejected as meritless. Southern's internal documents establish the objection was taken only as a delaying tactic.

13. Although the NS predecessors raised no other objection to the statements of accounts, counsel for the interlines did offer one objection to Reading's demand for immediate payment. Specifically, interline counsel contested Reading's right to receive cash until it in fact had paid cash to the underlying freight claimants by redeeming their notes.

14. Interline counsel was correct in his position that Reading's claim for cash would not mature until the underlying claimant notes were redeemed.

15. The parties agreed that Reading had no right to payment until the underlying notes to shippers were redeemed.

16. Both by operation of law and by agreement between the parties, Reading's claim for payment did not ripen until it redeemed the notes on and after April 1, 1988.

17. By its letters of April 1, 1988, and October 20 and 21, 1988, Reading notified NS that the underlying notes had been redeemed and that payment was due.

18. The failure-to-adopt-an-executory-contract defense then offered by NS is factually without foundation.

19. Reading's cause of action accrued no earlier than April 1, 1988, when it began redeeming the underlying claimants' notes. This action was commenced on December 11, 1991, within the applicable four-year statute of limitations.

20. By its failure to object to the statements of account presented by Reading in 1981, NS is deemed to have accepted them and is liable for the amounts stated therein.

21. By only objecting that Reading's right to payment was conditioned upon Reading's redeeming its notes, NS became legally obligated to pay the amount stated when Reading paid those notes.

22. NS is obligated to Reading for the amounts stated, $111,524.36, less the notes that were not presented for payment, a total of $764.63, and further reduced by the notes due the MS predecessors totalling $25,912.00, a net of $84,847.73.

23. Reading is entitled to judgment against NS in the amount of $84,847.73.

24. Reading is entitled to interest commencing April 1, 1988.

An appropriate order follows.

### ORDER

AND NOW, this 4th day of October, 1994, it is hereby ordered that judgment is entered in favor of plaintiff and against defendant in the principal amount of $84,847.73, plus prejudgment interest commencing April 1, 1988, at the rate of six percent per annum in accordance with 41 Pa.Cons.Stat.Ann. § 202 (1992), postjudgment interest under 28 U.S.C. § 1961, and costs otherwise allowable.